FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 4 - 2014 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
GODSON O. AKRAN,

                              Plaintiff,

       -against-

THE UNITED STATES OF AMERICA,

                              Defendant.
-------------------------------------------------------------x

**MEMORANDUM & ORDER**

12-CV-0929 (ENV)(JMA)

VITALIANO, D.J.

       Plaintiff Godson Akran, a United States citizen, filed this action asserting a false imprisonment claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, et seq. Akran alleges that, after he was released from a term of imprisonment resulting from felony fraud convictions, immigration officials wrongfully detained him in connection with removal proceedings. The detention lasted approximately one year, from April of 2007 through April of 2008, despite Akran's status as an American citizen. The United States moved to dismiss plaintiff's claim under FED. R. CIV. P. 12(b)(6) on the ground that the government's arrest and subsequent detention was "legally privileged." Akran opposes that motion and also seeks to amend his complaint to include a claim for abuse of process. For the reasons discussed below, the government's motion to dismiss is granted and plaintiff's motion to amend is denied.

1

## Background

I.   Significant History

Akran was born to Shade Odubiyi and Clifford Akran in Nigeria on April 17, 1980. (Compl. at ¶7-8.) Akran's parents were not married, and his father never "legitimated" him under the laws of Nigeria. (Compl. at ¶6-7.) In 1996, while plaintiff was living in Nigeria, his mother was naturalized as a United States citizen. *Id.* In 1997, when Akran was 17 years old, he was admitted to the United States as a legal permanent resident. (Compl. at ¶8-9.) Although it is unclear whether plaintiff realized it at the time, he had become a United States citizen by operation of law in 1997 when he established permanent residence in the country. (Compl. at ¶11); *see* 8 U.S.C. § 1432(a)(3)-(5) (repealed 2000). The right of citizenship flowed to him because the former § 1432 provided that a child of a United States citizen derived citizenship automatically upon:

> (3) . . . the naturalization of the mother if the child was born out of wedlock *and the paternity of the child has not been established by legitimation*; and if
>
> (4) Such naturalization takes place while such child is unmarried and under the age of eighteen years; and
>
> (5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of . . . the parent naturalized under . . . (3) or thereafter begins to reside permanently in the United States while under the age of eighteen years.

*Id.* (emphasis added). In accordance with these provisions, manifestly, because it now appears that Akran's father never legitimated him in Nigeria, when Akran was lawfully admitted to the United States when he was 17 years old, because his mother

2

was a naturalized United States citizen, Akran became a United States citizen too by operation of law. Notably, however, it was an event that went unnoticed and unremedied for a decade. Neither Akran nor his mother applied for Akran's certificate of citizenship until 2007.[1]

On August 9, 2005, Akran was convicted of fraud, bank fraud, conspiracy to commit identification fraud, and identification fraud in the United States District Court for the Southern District of New York. (Def.'s Mem. Ex. 7.)[2] He was sentenced to 33 months custody and ordered to pay restitution of $52,500. As part of the same prosecution, Akran was also convicted on one count of committing an offense while on release. On that count he was sentenced to a prison term of 13 months, to run consecutively to his 33 month sentence, and ordered to pay restitution in the amount of $67,679.29. Plaintiff served his sentences at the Federal Correction Institution in Otisville, New York ("FCI Otisville").

On March 17, 2007, while Akran was serving his sentence in FCI Otisville, he was questioned by Immigration Customs and Enforcement ("ICE") Agent Jose de Jesus about his citizenship status. (Compl. at ¶12.) Akran alleges that, during this interview Agent de Jesus "became aware" of sufficient information to conclude that Akran had derived citizenship from his mother's naturalization. (Compl. at ¶12.) The complaint does not allege what facts Akran conveyed to the agent that support

---

[1] Once an individual derives citizenship, the child—or the child's parent—may immediately apply for a certificate of citizenship.

[2] For reasons discussed below, the Court will take judicial notice of several documents submitted by the government relating to plaintiff's arrest, time served, and subsequent administrative proceedings.

plaintiff's conclusion. In any event, a warrant was issued for Akran's arrest in connection with removal proceedings. With the lodging of this detainer, following the conclusion of Akran's sentence at FCI Otisville on April 17, 2007 he was transferred to ICE's custody at Port Isabel Processing Center in Los Frenos, Texas. (Compl. at ¶15-16.)

Akran remained in detention in Los Frenos without a hearing for three months. On July 16, 2007, a bond hearing was convened before the Executive Office for Immigration Review. (Compl. at ¶17; Def.'s Mem. Ex. 13.) At that hearing, an immigration judge denied bond, informing Akran that he needed to present evidence of his father's non-legitimation. *Id.* On July 23, 2007 a second hearing was held before the same immigration judge, at which time he presented "evidence and argument" that he was a United States citizen. (Compl. at ¶17.) Specifically, Akran presented an affidavit from his mother as well as a copy of his mother's naturalization certificate. (Def. Mem. Ex. 14.) Akran also testified that his father never legitimated him. *Id.* Nevertheless, in a written decision, dated August 2, 2007, the immigration judge refused to release plaintiff from custody on the finding that his mother's affidavit did not state that Akran's father never legitimated him. (Def. Mem. Ex. 15.) Akran appealed that decision to the Board of Immigration Appeals ("BIA"), and, on September 25, 2007, the BIA affirmed the IJ's decision without opinion.

Then, on October 5, 2007, while still in custody in Texas, plaintiff filed an application for a certificate of citizenship with United States Citizenship and

Immigration Services ("CIS"). (Compl. at ¶19.) Akran's citizenship application was totally independent from and unconnected to the removal proceedings that had resulted in his detention. During the pendency of Akran's separate and distinct citizenship application, the immigration court held multiple hearings regarding Akran's citizenship status, but adhered to its prior determinations that he had not established his citizenship and that his release should be denied. (Def.'s Mem. Exs. 22, 25, 27, 29, 31). According to the complaint, on January 3, 2008, the minions from CIS had determined that Akran's application for a certificate of citizenship was approvable, pending payment and the location of certain "original file-work." (Compl. ¶20.) On January 7, 2008, Akran filed a motion to terminate his removal proceedings in the immigration court, allegedly presenting this further evidence of his citizenship. (Id. ¶20.)

Notably, plaintiff's January 7 termination motion (Defendants' Ex. 28) is very much to the contrary. Indeed, that motion states merely that Akran provided the government with a "copy of the N-600 application filed with CIS, which in conjunction with other evidence . . . establish his U.S. citizenship," and requests that "his case be administratively closed pending adjudication of his N-600 application."[3]

---

[3] "[A] Form N-600, Application for Certificate of Citizenship, is filed to obtain a Certificate of Citizenship" in cases where the applicant "became a U.S. citizen by operation of law after [his] birth but before [he] turned 18 years of age." (*See* http://www.uscis.gov/n-600.)  Following the filing of an N-600 application, "USCIS determine[s], based on the evidence submitted in support of [the] application, whether [the applicant is] required to appear in person for an interview." (*Id.*) If CIS approves an application, CIS issues a Certificate of Citizenship and the applicant must then attend an Oath of Allegiance ceremony at a local CIS office.

(Id.) As to any "conditional approval" by any CIS official there is absolute silence. Further, a far cry from conditional approval, on February 20, 2008 plaintiff's counsel requested a continuance of a scheduled hearing before the immigration judge because "counsel has spoken to a legal expert in Nigeria who may submit an expert affidavit clarifying the paternity laws ... however, counsel does not believe that the affidavit can be obtained prior to the scheduled hearing." (Defendants' Ex. 30.) In short, Akran's citizenship remained a disputed fact through at least February 2008, with both sides recognizing that it was incumbent upon Akran to provide missing verification of his father's failure to legitimize him in Nigeria to carry the day in the immigration proceeding that had precipitated his detention. That the same proffer might satisfy the open items in his citizenship application pending before CIS independently is wholly immaterial to the propriety of the detention ordered by the immigration court.

Finally, on April 3, 2008, CIS approved Akran's application for citizenship. On April 9, 2008 plaintiff's counsel submitted an amended removal termination petition indicating that the government was now "not opposed to this motion." On April 21, the immigration judge terminated Akran's removal proceedings. Akran alleges that it was at this point that he was released. (Id. ¶24.)

II. Procedural History

---

(*Id.*) The average processing time for an N-600 application is 5 months. (http://www.uscisprocessingtimes.org/uscis-local-offices/.) Given that Akran submitted his application on October 5, 2007, one would expect that CIS would render a decision in April 2008, which is precisely what occurred.

6

In November 2008, plaintiff filed an administrative complaint with the United States Department of Homeland Security ("DHS") alleging false imprisonment. (Compl. at ¶3.) It was a necessary precursor to any future FTCA claim. When DHS failed to respond within six months, plaintiff commenced an FCTA action, as authorized by 28 U.S.C. § 2675(a).[4] Plaintiff initially filed this case in the Southern District of Texas, where he had been detained. On August 29, 2011, the government filed a motion to dismiss it for improper venue, or, in the alternative, for failure to state a claim upon which relief could be granted. (Dkt. # 15). On February 24, 2012, the Southern District of Texas issued an order finding that venue there was improper because Akran's detention interview, removal proceedings, and statutorily mandated detention were initiated while he served his sentence at FCI Otisville, which is located in this district. (Dkt. # 22.) As a result, the action was transferred here.

The government, on April 30, 2013, again moved to dismiss. It urges that Akran has failed to establish a prima facie case for false imprisonment under either New York or Texas law because his arrest and imprisonment was legally privileged. Akran, on the other hand, argues that his arrest could not be legally privileged because the government possessed actual knowledge of his citizenship while he was detained.

---

[4] Government inaction opens the courthouse doors. "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section." 28 U.S.C. § 2675(a).

## Discussion

I.  Controlling Law

   A. <u>Standard of Review</u>

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers 'labels and conclusions' . . . will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555); see also *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

To survive a Rule 12(b) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotations omitted); see *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (interpreting *Twombly* to require a "plausibility standard" that "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible") (emphasis omitted), *rev'd on*

*other grounds*, 129 S. Ct. 1937 (2009). On a Rule 12(b)(6) motion, the Court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

The court may only consider the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Int'l Audiotext Network, Inc. v. Am. Tel.& Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). A court may judicially notice any facts not subject to dispute if they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 88 (2d Cir. 2012) (quoting Fed. R. Evid. 201(b)(2)). In particular, "[a]gency determinations and administrative findings are public records of which a court may properly take judicial notice." *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012) (citations omitted). Court records in a pending, related immigration proceeding are no exception. *See, e.g., Rosario v. New York City*, 2013 WL 2099254, at *1 n.1 (S.D.N.Y. 2013) (noticing immigration court removal order); *Leybinsky v. U.S. Immigration & Customs Enforcement*, 2013 WL 132544, at *1 n.3 (S.D.N.Y. 2013) (noticing additional INS removal charge); *Gui Ha Ke v. Morton*, 2012 WL 4715211, at *4 (S.D.N.Y. 2012) (noticing Immigration and Customs Enforcement release and removal records); *Fornalik v. Perryman*, 223 F.

3d 523, 529 (7th Cir. 2000) (noticing Immigration and Nationalization Services records); *Lising v. INS*, 124 F.3d 996, 998 (9th Cir. 1997) (same). The principled limitation to this rule is that, while the Court may take notice that certain documents and statements exist on the record, no statements may be relied upon "for the truth of the matters asserted." *See, e.g., Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (citation omitted).

Finally, should a district court find the pleadings to be inadequate, Rule 15(a) provides that the court should freely grant leave to amend those pleadings when justice so requires. A court may deny leave to amend "when an amendment is offered in bad faith, would cause undue delay or prejudice, or would be futile." *Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1198 (2d Cir. 1989) (citation omitted).

### B. Applicable State Law

The FTCA subjects the United States to liability in tort "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [tortious] act or omission occurred." 28 U.S.C. § 1346(b)(1). In this case, plaintiff was initially detained and interrogated by ICE in New York, with his detention subsequently transferred to Texas where he remained for the entirety of his immigration detention. Both New York or Texas law would, thus, appear in play. Notably, in its order transferring the case here, the Southern District of Texas stated that the essential "acts" of plaintiff's claim, including the initiation of removal proceedings, initial custody, and most

10

importantly the determination that he was subject to mandatory detention, all took place in New York. (Dkt. # 22 at 3-4.)

Ultimately, and in harmony with the transfer order, while the Court believes that New York law applies, the analysis remains essentially the same under either Texas or New York law. In both states, false imprisonment requires (1) a willful detention, (2) without petitioner's consent, and (3) without "privilege" or "authority of law." *Compare Liranzo v. United States*, 690 F.3d 78, 91 (2d Cir. 2012), *with Dillard Dept. Stores, Inc. v. Silva*, 106 S.W.3d 789, 795 (Tex. App. 2003). Further, both New York and Texas defer to federal law to determine whether an arrest or detention effectuated by an immigration official was privileged. *Compare Liranzo*, 690 F.3d at 95 (determining whether an arrest was "privileged" relies on "consulting federal privileges applicable to federal immigration officers"), *with Nguyen v. United States*, 2001 WL 637573, at *7 (N.D. Texas 2001) ("Because INS agents are federal agents acting pursuant to federal law, a Texas court would consult federal law to determine whether the plaintiff was lawfully detained."). Thus, whether plaintiff's detention was "privileged" depends on governing federal immigration law, which requires that "the actions of ICE officers must be reasonable and the detention must be conducted in accordance with federal standards." *Liranzo v. United States*, 2013 U.S. Dist. LEXIS 59333 at *10 (E.D.N.Y. 2013); *Hyatt v. United States*, 968 F. Supp. 96, 108 (E.D.N.Y. 1997).

II. Analysis

11

The dispute for purposes of this motion pivots on a single inquiry—was plaintiff's detention legally privileged. The United States contends that its arrest and subsequent detention of plaintiff were legally privileged because federal law mandated that plaintiff, as a suspected non-citizen convicted of serious felonies, be detained during the pendency of his removal proceedings. (Def. Mem. at 14) (citing 8 U.S.C. § 1226(c)(1)(B)). Akran, on the other hand, claims that immigration officials possessed actual knowledge that he was a United States citizen, and therefore, that his continued detention was not legally privileged.[5]

The government relies on the fact that, in Akran's removal proceeding, the burden of establishing citizenship fell on Akran because he was born outside of the United States. (Def. Mem. at 15-17.) In essence, the United States argues that, until the immigration judge was convinced of Akran's citizenship (according to the evidence proffered by Akran), the United States was justified in continuing to detain him as a suspected alien whose felony convictions rendered him subject to removal. To hold otherwise, the government contends, would impermissibly shift the burden of establishing the non-citizenship for foreign-born individuals in removal proceedings to the United States. Not only would such a holding punish with FTCA

---

[5] Akran further contends that the Court may not consider the materials from his various administrative proceedings cited in defendant's motion papers because those materials were not referenced in his complaint. He is wrong. As noted above, "[a]gency determinations and administrative findings are public records of which a court may properly take judicial notice." *Lia v. Saporito*, 909 F. Supp. 2d 149, 161 (E.D.N.Y. 2012) (citations omitted); *Rosario v. New York City*, 2013 WL 2099254, at *1 n.1 (S.D.N.Y. 2013) (noticing immigration court removal order). Accordingly, the court will consider the contents of Akran's administrative record for purposes of the instant motion.

and/or *Bivens* claims for any federal removal proceeding, it would stretch the thin resources of immigration officials who would be required to investigate each and every claim of citizenship, including, as in this case, whether Akran's father had acknowledged paternity in Nigeria.

Akran is undeterred. He contends in both his complaint and his motion papers that the United States possessed *actual knowledge* of his citizenship during his entire period of detention, yet continued to detain him. Specifically, Akran argues, first, that Agent DeJesus "knew" of plaintiff's citizenship because, at his interview at FCI Otisville, Akran "disclosed sufficient information to determine that Plaintiff was a United States citizen." (Compl. ¶ 12.) Most likely, had this allegation stood alone, it could carry the day at threshold. But, the facts disclosed to Agent De Jesus do not stand alone and cannot be squared with the fact, also properly before the Court on the motion, that an immigration judge considered this very same evidence in the summer of 2007 and concluded that Akran had not met his burden of establishing citizenship because there was an open question regarding his father's non-legitimation. Clearly, given the conclusion reached by the immigration judge after considering the same evidence that Akran presented to Agent DeJesus, the Court cannot fairly conclude that agent De Jesus possessed "actual knowledge" of Akran's citizenship. More importantly to the disposition of this motion, the proceedings in the immigration court point with precision, when the record properly before the Court is viewed <u>de novo</u>, to the information that was missing from Akran's immigration file. Nothing in the pleadings, succinctly, points

13

to Akran supplying such information to Agent De Jesus or to the immigration judge at any time prior to the approval of his citizenship application by CIS. In fact, the record shows that Akran's immigration counsel, in January 2008, sought a continuance in an attempt to gather it.

Akran next contends that on January 3, 2008 CIS determined that his application was "approvable," but that the government continued to oppose his release nonetheless. According to Akran, at this point the government had "actual knowledge" of his citizenship and should have immediately released him. In support of this argument, Akran relies heavily on *Nguyen v. United States*, 2001 U.S. Dist. LEXIS 7512 (N.D. Texas 2011). In *Nguyen*, which is not binding on the Court, petitioner, who did not speak English, incorrectly informed immigration authorities that he was a non-citizen when, in reality, he had obtained derivative citizenship several years earlier. The United States detained Nguyen in anticipation of removal for fifteen months. In denying the United States' motion for summary judgment on Nguyen's subsequent false imprisonment claim, the court held that "there is a genuine issue of material fact as to whether the INS followed proper procedures in reviewing Plaintiff's documentation and failing to recognize that derivative citizenship law applied to the facts of Plaintiff's case." *Nguyen* at *26. Further, "[t]hat the Plaintiff had the burden of proving citizenship at his removal hearing does not . . . negate the fact that the INS did not have authority to detain him if it knew he was a U.S. citizen." *Id.* at *30.

Critically, however, a review of Akran's immigration proceeding shows that it was far removed from *Nguyen*, where the government possessed <u>all</u> the information necessary to confirm Nguyen's citizenship yet continued to detain him. In *Nguyen* there was a colorable argument that immigration records established his citizenship and that government authorities had disregarded them. Failure to look is not the issue here, for it is indisputable that at the time of his initial detention Akran's immigration records collectively did not establish his citizenship and that detention was not improper. In point of fact, whether Akran's father legitimated him or not remained an open question until CIS approved his N-600 application.

Whether someone at CIS told plaintiff that CIS had "conditionally approved" his citizenship application on January 3, 2008 is ultimately immaterial. First, it is an acknowledgment that <u>final</u> approval had not been justified. Indeed, Akran's counsel recognized that the battle was not yet won, making no mention of any such approval in her motion to terminate filed just four days afterwards. Further, on February 20, 2008 Akran's counsel requested an adjournment of a scheduled hearing in front of the immigration judge to give counsel more time to locate paperwork from Nigeria related to the legitimation issue. (Government Ex. 30.) Bluntly, the record clearly demonstrates that plaintiff's citizenship remained disputed (*i.e.* that Akran had not carried his burden to establish it) until the CIS approved Akran's application on April 3, 2008 and that the delay in obtaining Akran's release was due, at least in part, to an extension of time requested by his

own counsel. Under these facts, the Court concludes that the government's detention of Akran until April 3, 2008 was legally privileged.

In reaching this conclusion, the Court is not unmindful that the government is not free to close its eyes to facts that melt away the privilege. "[A] lawful detention can become unlawful at the point at which the INS's decision to continue the detention is no longer reasonable." *Nguyen* at *27; *Caban v. United States*, 728 F.2d 68, 75 (2d Cir. 1984). Change did come, but it came on the second front— citizenship approval was granted. CIS advised that it was sufficiently satisfied with the proof offered by Akran to establish that his father had not legitimated him in Nigeria. On April 9, 2008 plaintiff's counsel filed an amended motion to terminate Akran's removal proceedings based on CIS's final citizenship approval. (Government Ex. 34.) That motion indicated that Akran's counsel was notified on April 2 that Akran's N-600 application was approved and further stated that *"[Akran] was released from DHS custody on April 3, 2008."* (Id.) (emphasis added.) The motion also indicated that the government consented to termination of removal proceedings at that time. (Id.) Thus, although Akran contends that the government continued to detain him until April 21, 2008 when the immigration judge approved the termination motion, (Compl. ¶ 23), the record conclusively demonstrates that Akran was actually released from custody on the same date that CIS approved his citizenship application. Even assuming a brief physical detention of plaintiff beyond the citizenship approval date, such *de minimis* detention during the processing of his release, absent an allegation of bad faith, of which there is none, would not be

16

actionable under New York law—the privilege would adhere to the release processing detention. *See Liranzo v. United States*, 2013 U.S. Dist. LEXIS 59333, at *12-13 (E.D.N.Y. 2013) (continued detention of petitioner for 4 days while immigration officials processed final citizenship paperwork was "reasonable and . . . in accordance with federal standards.") Accordingly, the Court concludes that Akran's detention was legally privileged for its entire duration.

III. Plaintiff's Request to Amend

Plaintiff seeks leave to amend his complaint to add a claim for abuse of process. Absent from his papers is a copy of his proposed amended complaint. It is well-settled that when seeking leave to amend, the movant must submit "a complete copy of the proposed amended complaint . . . so that both the Court and the opposing party can understand the exact changes sought." *La Barbera v. Ferran Enterprises, Inc.*, 2009 WL 367611 at *3 (E.D.N.Y. 2009); *McFadden v. Grand Union*, 1994 WL 62351 (S.D.N.Y.1994). Accordingly, plaintiff's motion for leave to amend his complaint is denied.

In any event, the facts that plaintiff alleges in his main claim and other facts properly before the Court on this motion establish that no abuse of process claim will lie. Abuse of process in New York requires a showing that defendant "(1) employed regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Hoffman v. Town of Southampton*, 523 Fed. Appx. 770, 771 (2d Cir. 2013). Further

17

gutting Akran's putative abuse of process claim, "[n]either retaliation nor a malicious motive ... is a sufficient collateral objective to satisfy ... a cognizable malicious abuse of process claim," as "New York law requires an ulterior purpose or objective in facilitating the prosecution." *Id.* at 772 (citation omitted). Nothing in this record even remotely suggests that any attempt to state an abuse of process claim would be anything but futile.

## Conclusion

For the foregoing reasons, the United States' motion to dismiss is granted. Plaintiff's motion to amend his complaint is denied without prejudice.

So ordered.

Dated: Brooklyn, New York

January 24, 2014

/s/(ENV)

ERIC N. VITALIANO
United States District Judge